# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| JUDITH A. WILBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-CV-04235-NKL |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff Judith A. Wilber ("Wilber"), challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and under Title XVI for supplemental security income.

Wilber's initial application was denied, and she appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing was held on November 17, 2008, the ALJ found that Wilber was not "disabled" as that term is defined in the Act. The Appeals Council denied Wilber's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Wilber argues that the record does not support the ALJ's finding that she was not under a disability because 1) the ALJ erred when he determined Wilber could return to her

past work because he failed to make explicit findings of the functional demands of Wilber's past work and compare those demands with Wilber's residual functional capacity ("RFC"); and 2) the ALJ erred when he determined Wilber's restless leg syndrome was non severe at step two of the sequential evaluation process. Because this Court finds no reversible error in the ALJ's decision, Wilber's Complaint [Doc. # 3] is denied.

## I. Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the time of the hearing, Wilber was fifty-eight years old with a high school education and one year of college. Wilber's past work primarily included a cashier, stocker, customer service worker, server, and data entry worker. Wilber alleges that she became disabled on or about December 27, 2005. Wilber claims she became disabled because of hernias and a right knee injury.

### A. Medical Records

#### 1. Treatment for Knee Injury

On December 29, 2005, Wilber presented to the emergency room after falling on the floor and injuring her right knee. On examination, Wilber had tenderness and swelling in her right knee, but was otherwise normal. Right knee x-rays revealed no fracture, significant joint effusion, or other acute abnormality. On January 3, 2006, magnetic resonance imaging (MRI) of Wilber's right knee revealed a "slight" effusion and "mild" edema of the

---

[1] Portions of the parties' briefs are adopted without quotation designated.

subcutaneous fat, but was otherwise negative.

On January 10, 2006, Wilber presented to Jeffrey Jones, D.O., for follow-up with her right knee pain. On examination, Wilber had mild soft tissue swelling in her right knee and discomfort with extension and flexion of the right knee. Right knee x-rays were negative. Dr. Jones noted that Wilber's prognosis was good, and he instructed Wilber to begin range of motion exercises.

On January 24, 2006, Wilber reported improvement in her right knee pain. She continued to have some discomfort in her knee and complained of intermittent swelling. Wilber reported that she slipped and twisted her left ankle a week prior to her appointment. On examination, Wilber had minimal right knee swelling and good stability. She had crepitation and patellar grind in her right knee. Wilber also had tenderness in her left ankle, but no soft tissue swelling. Left ankle x-rays were negative. Dr. Jones assessed a right knee contusion and left ankle sprain.

On February 8, 2006, Wilber reported continued pain in her right knee. She had pain with squatting and climbing stairs. Dr. Jones noted that Wilber walked without an assistive device. On examination, Wilber had patellar grind and popping and catching in her right knee. She had full extension with "good" quadricep strength and "excellent" flexion of the right knee. Wilber reported tenderness in her left ankle, but she had good left ankle motion and no significant swelling. Dr. Jones recommended right knee arthroscopy. On February 23, 2006, Wilber underwent diagnostic and operative arthroscopy of the right knee performed by Dr. Jones.

On March 1, 2006, Wilber reported that she was performing her exercises and progressing well following her surgery. On examination, Wilber had minimal effusion. She had full extension of the right knee and good ankle and hip motion. Dr. Jones instructed Wilber to continue with her exercises. One week later, Wilber stated that her knee pain had subsided "somewhat." She had some swelling around her knee, but a physical examination revealed no irritability of the knee and good stability on stress testing. Dr. Jones advised Wilber to begin physical therapy.

From March 13, 2006 through May 11, 2006, Wilber participated in physical therapy. She complained of right knee pain and decreased mobility, particularly with climbing stairs and squatting. On May 1, 2006, x-rays of Wilber's right knee revealed no fracture, dislocation, joint effusion, or significant degenerative changes. Ten days later, in a discharge summary, the physical therapist noted that Wilber's functional status was "good," and she did not return to physical therapy. The physical therapist also noted that Wilber had returned to work.

On March 22, 2006, Wilber returned to Dr. Jones, who noted that she seemed to be doing fairly well postoperatively. On examination, Wilber had mild effusion of the right knee and mild tenderness. She was 5 degrees short of full knee extension, and she was able to flex her knee comfortably to 80 or 90 degrees.

On April 10, 2006, Wilber stated that she felt a little better. She denied numbness and tingling, but she reported some mild swelling. On examination, Wilber's right knee had minimal effusion, mild crepitation, and mild joint line tenderness on palpation. She had no

4

clicks or pops. A patella grind test was negative. Wilber was able to extend her right knee within 2 to 3 degrees of full extension, and she could flex her knee to about 90 degrees. Dr. Jones indicated that Wilber was limited to light duty work with no walking or standing for more than 30 minutes. Dr. Jones further indicated that Wilber could perform desk duties if available.

On May 1, 2006, Wilber reported that her right knee swelling had improved. She also reported improvement in her pain with physical therapy. On examination, Wilber had no right knee effusion or erythema. She had patellar crepitus and some right knee tenderness. Wilber had good strength, stability, and patellar mobility. Dr. Jones instructed Wilber to continue use of the nonsteroidal anti-inflammatory drug (NSAID) Naprosyn. Dr. Jones stated that Wilber could return to work provided that she performed a light duty desk job involving no prolonged standing and no squatting.

On May 26, 2006, Wilber stated that she felt better. She was increasing her activities and she had less discomfort. Wilber had no additional right knee swelling. On examination, she had full extension of her right knee, and she could flex her right knee to 135 degrees. Dr. Jones noted that Wilber's right knee seemed to be stable and her quadricep strength was improving. She was instructed to continue to work on strengthening her knee and maintaining her range of motion. Dr. Jones stated that Wilber could return to work without restrictions.

On June 26, 2006, Wilber reported some activity related pain with prolonged standing. She had decided to change careers and obtain "more of a sitting job," which Dr. Jones

5

believed was a good idea. Wilber reported some popping and cracking of the knee anteriorly and difficulty climbing stairs. She had no significant recent knee swelling, but she reported some swelling with increased activity. On examination, Wilber had mild tenderness along the patellar tendon. She was able to fully extend her knee, and she had 5-/5 strength. Dr. Jones noted that Wilber had a "nice stable" knee. He recommended additional physical therapy, but Wilber stated that she preferred a home exercise program. Dr. Jones prescribed an NSAID and instructed Wilber to continue increasing her activity and endurance as tolerated.

### 2. Treatment for Hernia and Restless Leg Syndrome

On September 19, 2006, Wilber presented to the Medical Missions for Christ Clinic (MMCC) with complaints of stomach pain. The treatment provider noted a history of hernia repair, and a physical examination revealed an incised hernia. The physical examination was otherwise normal. On November 21, 2006, Wilber complained of facial flushing and leg cramps. On January 9, 2007, Wilber complained of a headache. The treatment provider prescribed medication for leg pain. On March 6, 2007, Wilber returned to MMCC and complained of "aching legs and shooting pain." A physical examination noted a history of hernia repair, but was otherwise normal. The treatment provider assessed restless leg syndrome and prescribed medication.

On April 24, 2007, Wilber reported leg pain and claimed she could not walk far. A physical examination revealed an abdominal hernia and scar, but was otherwise normal. A neurological examination was within normal limits. The treatment provider assessed restless

6

leg syndrome and abdominal hernia. On May 22, 2007, Wilber complained of "constant" aching in her legs. A physical examination was normal, and the treatment provider at MMCC noted no neurological or musculoskeletal abnormalities.

On June 19, 2007, Wilber reported that she was not sleeping well lying down. A physical examination was normal. A neurological examination was within normal limits. The treatment provider assessed "restless legs." On August 7, 2007, the treatment provider at MMCC noted no neurological or musculoskeletal abnormalities. The treatment provider assessed a ventral hernia.

On September 5, 2007, Wilber presented to MMCC and complained of a headache. A physical examination revealed mild sinus drainage, but was otherwise normal. Wilber's neurological and musculoskeletal systems were within normal limits. On November 20, 2007, Wilber complained of coughing, ear pain, and restless legs. The treatment provider assessed a ventral hernia, allergic rhinitis, cough, and hypertension. On January 8, 2008, Wilber complained of a cough and shortness of breath. A physical examination revealed no neurological or musculoskeletal abnormalities. The treatment provider's assessment included restless leg syndrome.

On March 20, 2008, Wilber reported that her legs ached intermittently during the day and night. A physical examination was normal. The MMCC treatment provider's assessment included restless leg syndrome. On July 29, 2008, Wilber reported leg aching, which occurred primarily at night. A physical examination revealed a ventral hernia, but was otherwise normal. The treatment provider specifically noted that Wilber's peripheral reflexes

were intact. The treatment provider assessed restless leg syndrome and a ventral hernia. She instructed Wilber to pursue surgery if the ventral hernia worsened.

### B. Wilber's Testimony

At the administrative hearing held on November 17, 2008, Wilber testified she had completed high school and one year of college. Wilber testified that she could not work because she had difficulty standing, walking, bending, squatting, and sitting due to a right knee injury, an abdominal hernia, leg pain, and foot pain. She testified that she could sit for only 15 to 20 minutes and stand for only 10 minutes.

Wilber also testified that she had problems sleeping because her legs ached and throbbed. She stated that her doctor initially thought she had restless leg syndrome, but her doctor did not perform any tests and later changed her diagnosis. Wilber testified that she spent most of her day lying on the couch with her legs elevated. Wilber stated that she performed some household chores, including dusting and washing dishes and shopped for groceries once per month.

### C. The Vocational Expert's Testimony

A vocational expert also testified at the administrative hearing. The ALJ questioned the vocational expert regarding the requirements of Wilber's past relevant work as she described it and as it was generally performed in the national economy. The vocational expert testified that Wilber's past relevant work included the jobs of records clerk, data clerk, and customer service clerk. The vocational expert further testified that the job of records clerk was generally classified as semiskilled, sedentary work and Wilber described it as

heavy work; the job of data clerk was generally classified as semiskilled, sedentary work and Wilber described it as sedentary work; and the job of customer service clerk was generally classified as semiskilled, light work and Wilber described it as sedentary work.

## II.     The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

> The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that Wilber was not disabled. At step one, he determined that Wilber was not engaging in substantial gainful activity since December 27, 2005.

At step two, the ALJ determined Wilber was severely impaired by recurrent ventral hernia; lower extremity edema with standing; and arthritis of the knee. The ALJ determined that Wilber was not severely impaired by restless leg syndrome or mental illness.

At step three, the ALJ determined that Wilber did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

At step four, the ALJ considered the medical records and other evidence and found that Wilber has the residual functional capacity to perform sedentary work.

At the fifth step, the ALJ considered the testimony of the VE and determined that Wilber is capable of performing past relevant work as a records clerk, a data clerk, and a customer service clerk because this work does not require the performance of work-related activities precluded by Wilber's functional limitations. Therefore, the ALJ found that Wilber was not disabled.

## III. Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at *1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is

true even where a claimant is represented by counsel. *Id.*

## IV. Discussion

Wilber argues that the ALJ erred 1) when he determined Wilber could return to her past work because he failed to make explicit findings of the functional demands of Wilber's past work and compare those demands with Wilber's RFC; and 2) when he determined Wilber's restless leg syndrome was non severe at step two of the sequential evaluation process. This Court finds no reversible error in the ALJ's decision.

### A. The ALJ Properly Determined Wilber's RFC and that She Could Perform Past Relevant Work

#### 1. Wilber's RFC

Wilber argues that the ALJ improperly assessed her RFC. A claimant's RFC represents the most she can do despite the combined effect of all her credible limitations. *See* 20 C.F.R. §§ 404.1545 and 416.945 (2009). An ALJ must assess a claimant's RFC based on all the record evidence, including the medical records, observations of treating and examining physicians, and the individual's own descriptions of her limitations. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ, however, is not required to accept a claimant's alleged limitations at face value. Instead, the ALJ must evaluate the credibility of a claimant's complaints of limitation consistent with the framework set forth at 20 C.F.R. §§ 404.1529, 416.929 (2009), and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). That framework requires consideration of such factors as the claimant's work history; observations by third parties and physicians regarding the claimant's disability; the

claimant's activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; and the dosage, effectiveness and side effects of medications. *See Polaski*, 739 F.2d at 1322.

Where, as here, an ALJ discredits a claimant's testimony for stated reasons, a reviewing court should normally defer to the ALJ's credibility findings. *See Russell v. Sullivan*, 950 F.2d 542, 545 (8th Cir 1991). Further, although an ALJ must consider the various medical opinions in assessing a claimant's RFC, the final determination of a claimant's RFC is left to the ALJ. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). In assessing a claimant's RFC, the ALJ may reject the opinion of any examining physician if it is inconsistent with substantial evidence. *See Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).

In this case, after evaluating the medical evidence of record, and properly assessing the credibility of Wilber's subjective complaints consistent with the framework set forth in *Polaski* and 20 C.F.R. §§ 404.1529 and 416.929, the ALJ found that Wilber could perform the full range of sedentary work.

Substantial evidence, including medical evidence, supports the ALJ's RFC assessment. For example, as the ALJ noted, although Wilber underwent knee surgery, the surgery was successful and her physical therapist noted that her functional status was "good." On May 1, 2006, x-rays of Wilber's right knee revealed no fracture, dislocation, joint effusion, or significant degenerative changes. Similarly, in June 2006, Dr. Jones noted that Wilber's knee was "nice [and] stable." Additionally, multiple physical examinations were

generally normal and revealed no neurological or musculoskeletal abnormalities.

As the ALJ noted, other than temporary restrictions following surgery, none of Wilber's treating or examining physicians opined that she was unable to work. In fact, on May 26, 2006, Dr. Jones indicated that Wilber could return to work without restrictions. It is significant that no physician who examined Wilber has found limitations consistent with disability. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000).

The ALJ also considered Wilber's daily activities in assessing her RFC. In documents completed as part of the disability application process, Wilber stated that she prepared meals, shopped for groceries, and performed household chores such as sweeping, dusting, washing laundry, and washing dishes. Wilber also indicated that she rode in cars, read, and watched television. The Eighth Circuit has indicated that activities which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001). Further, the ALJ noted that Wilber had a poor work record. From 1995 to 2005, Wilber had consistently low earnings. In all but three years, Wilber earned less than $10,000, and she earned less than $5,000 in four of those years. An ALJ may discount a claimant's credibility based upon her poor work record. *See Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996).

Wilber argues that the ALJ's RFC assessment is improper because the ALJ failed to include a function-by-function assessment of Wilber's work-related abilities as required by SSR 96-8p. Specifically, Wilber argues that the ALJ's RFC assessment failed to include specific findings regarding her ability to lift, stand, walk, sit, push, pull, and alternate

between sitting and standing.

The ALJ's RFC assessment sufficiently addressed Wilber's functional abilities. The ALJ found that Wilber could perform the full range of sedentary work. Sedentary work requires lifting no more than 10 pounds, sitting for 6 hours in an 8 hour workday, and standing or walking for no more than 2 hours in an 8 hour workday. *See* 20 C.F.R.§§ 404.1567(a) and 416.967(a); *see also* SSR 83-10. With respect to Wilber's ability to push, pull, and alternate between sitting and standing; the ALJ's RFC assessment for sedentary work indicates that Wilber can perform those activities to the extent they are consistent with and required by sedentary work.

Moreover, where all of the functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, a court can reasonably believe that those functions that he omitted were those that were not limited. *See Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003).

Wilber also argues that the ALJ erred by failing to provide a narrative discussion of the RFC assessment as required by SSR 96-8p. The ALJ fully discussed the medical and other evidence of record supporting his finding both before and after enumerating the RFC. The narrative discussion required by SSR 96-8p certainly does not prescribe such a rigid decision-writing template as that suggested by Wilber. The ALJ's decision, taken as a whole, includes discussion of the specific medical facts and non-medical evidence supporting the ALJ's RFC determination and fully explained and resolved all material inconsistencies in the record.

Wilber also argues that the ALJ failed to resolve the conflicts between Dr. Jones's May 1, 2006 statement that Wilber could perform light-duty desk jobs involving no prolonged standing or squatting and his June 2006 treatment note indicating that Wilber informed him she decided to change careers and obtain "more of a sitting job," which he believed was a good idea. Dr. Jones's May 1, 2006 statement is not inconsistent with his belief that Wilber's decision to obtain "more of sitting job" was a good idea, nor is it inconsistent with the ALJ's RFC finding that Wilber was limited to sedentary work. The June 2006 note merely indicates that Dr. Jones agreed with Wilber's self-proclaimed intent to seek a "sitting job," and he did not set forth any specific or additional work restrictions. Further, sedentary work does not require prolonged standing or squatting, and it involves sitting most of the day and lifting only minimal amounts of weight. *See* 20 C.F.R.§§ 404.1567(a) and 416.967(a); *see also* SSR 83-10. Thus, neither the RFC assessment nor the June 2006 treatment note conflict with Dr. Jones's May 1, 2006 statement. The ALJ properly determined Wilber's RFC after evaluating all the evidence of record regarding the effects of her impairments. The ALJ's RFC assessment is supported by substantial evidence in the record, including medical evidence.

### 2. Wilber's Past Relevant Work

Wilber argues that the ALJ improperly determined that she could perform her past relevant work. Specifically, Wilber argues that the ALJ failed to consider the functional demands of her past relevant work and compare those demands with her RFC. The ALJ properly compared Wilber's RFC with the demands of her past relevant work and determined

that she retained the ability to perform her previous work.

At step four of the sequential evaluation process, the ALJ was required to evaluate whether Wilber was able to perform her past relevant work in light of her RFC. *See Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007). If a claimant can perform her past relevant work, either as she performed it, or as the work is performed in the national economy, she is not disabled. *See Lowe v. Apfel* 226 F.3d 969, 973 (8th Cir. 2000). In this case, the ALJ relied, in part, on the testimony of a vocational expert. The ALJ asked the vocational expert to classify Wilber's work as she performed it and as it is generally performed in the national economy. The vocational expert testified that Wilber's past work as a records clerk was classified as sedentary work as it was generally performed in the national economy; Wilber's past work as a data clerk was classified as sedentary work as it was generally performed in the national economy and as she performed it; and Wilber's past work as a customer service clerk was classified as sedentary as she performed it.

The ALJ then compared Wilber's RFC for a full range of sedentary work with the demands of her past relevant work and determined that Wilber retained the ability to perform the job of records clerk as it was generally performed in the national economy, the job of data clerk as it was generally performed in the national economy and as Wilber actually performed it, and the job of customer service clerk as Wilber actually performed it. Consequently, the ALJ properly found that Wilber was not under a "disability." Accordingly, the ALJ's decision is affirmed.

**B.   The ALJ Properly Determined Wilber's Restless Leg Syndrome Was Not**

**Severe**

Wilber argues that the ALJ erred at step two of the sequential evaluation process in finding that restless leg syndrome was not a severe impairment. The Court finds that the ALJ properly considered her restless leg syndrome and determined that it was not a severe impairment because the medical evidence of record did not demonstrate that it resulted in significant functional limitations.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), and 416.921(a) (2009). Wilber bears the burden of establishing that she has a severe impairment. *See Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996). Objective medical evidence must confirm that an impairment is severe. *See* SSR 96-3p. A diagnosis alone is an insufficient basis for a finding that an impairment is severe. Rather, the severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality. *See, e.g.*, *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986). Moreover, 20 C.F.R. §§ 404.1509 and 416.909 state that, unless an impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months.

Here, as the ALJ noted, the medical evidence of record does not indicate that Wilber's restless leg syndrome resulted in significant functional limitations. For example, the only

medical evidence related to restless leg syndrome consists of occasional diagnoses by treatment providers at MMCC. The evidence of record contains no objective medical findings to support a diagnosis of restless leg syndrome, and Wilber testified that her doctors did not perform any objective diagnostic tests regarding restless leg syndrome. Multiple physical examinations were generally normal and revealed no neurological or musculoskeletal abnormalities. None of Wilber's treating or examining physicians opined that restless leg syndrome significantly limited her ability to do basic work activities, nor did Wilber allege that restless leg syndrome prevented her from working in the forms she completed as part of the disability application process. Accordingly, the ALJ did not err by failing to find that Wilber's restless leg syndrome was a severe impairment.

## V. Conclusion

Because this Court finds no reversible error in the ALJ's decision, Wilber's Complaint [Doc. # 3] is DENIED.

                                                    s/ NANETTE K. LAUGHREY  
                                                  NANETTE K. LAUGHREY  
                                                  United States District Judge

Dated: July 12, 2010  
Jefferson City, Missouri